In re **METLIFE DEMUTUALIZATION LITIGATION.**

No. CV–00–2258.

United States District Court, E.D. New York.

June 22, 2004.

Douglas Kraus, Skadden, Arps, Slate, Meagher & Flom LLP., New York City, for Movants.

Jared B. Stamell, Stamell & Schager, L.L.P., New York City, for Plaintiff/Consol Plantiffs.

Bruce E. Yannett, Carl J. Micarelli, Debevoise & Plimpton LLP., Duncan J. Logan, New York City, for Defendants.

## MEMORANDUM AND ORDER

PLATT, District Judge.

Defendant, Metropolitan Life Insurance Company ["MetLife"], moves under Federal Rules of Civil Procedure 9 and 12 and pursuant to the Private Securities Litigation Reform Act to dismiss the Second Claim for Relief contained in the Second Amended Complaint of the class action Plaintiffs in this litigation. This claim by former MetLife policyholders is one of securities fraud under Section 10(b) of the Securities Exchange Act of 1934 and its correlative Rule 10b–5.

Oral argument was heard April 30, 2004. For the following reasons, MetLife's motion to dismiss is **DENIED**.

### Background

The undersigned assumes familiarity with this Court's earlier decision denying MetLife's initial motion to dismiss Plaintiffs' original Complaint in this case, filed under Section § 12(a) of the Securities Act of 1933, in *In re: MetLife Demutualization Litig.*, 156 F.Supp.2d 254 (E.D.N.Y. 2001), and with the statement of facts set forth more fully therein, *see id.* at 258–60.

A. *Factual summary*

Briefly, in 2000 MetLife changed from a mutual life insurance company to a stock life insurance company. This demutualization took place with the unanimous approval of the Board of Directors, the permission of 93% of MetLife's 2,800,000 policy holders, and the imprimatur of the New York State Insurance Commission. This transaction converted MetLife's policy holdings into over 700,000,000 shares of stock valued at $14.25 per share, worth over $10,000,000,000 at the time. MetLife compensated each former policyholder with ten shares of MetLife stock in return for the policyholders' relinquishing of, *inter alia*, their voting membership interests in MetLife. Those termed "participating" policyholders, who also possessed interests in MetLife's then-$14,000,000,000 surplus, received further shares of stock claimed to be commensurate with their policies' contributions to the surplus. *See id.*, Plaintiffs' Second Amended Complaint at ¶¶ 28–54; MetLife's Memorandum of Law in Support of their Motion to Dismiss at 2–4; Policyholder Information Booklet at 6–7.

Plaintiffs are current MetLife shareholders and former MetLife participating policyholders. They claim that the Policyholder Information Booklet ["PIB"], which set forth the details of the demutualization prior to the vote that approved the transaction, contained material misrepresentations, made through misstatements and omissions, and that MetLife made such misrepresentations with the relevant scienter. Plaintiffs' Memorandum of Law in Opposition to MetLife's Motion to Dismiss at 8–10.

Specifically, Plaintiffs allege four misrepresentations in the PIB: (i) omitting to state that the actuarial method used to calculate policyholders' contributions to MetLife's surplus arrived at a value of $15,300,000,000, far higher than the $8,400,000,000 in stock that these policy holders received as compensation; (ii) omitting to state that MetLife's method of reorganization, an exchange of policies for stock with the right to elect cash, as opposed to an exchange of policies for cash with the right to elect stock, was chosen for the benefit of MetLife and not the policyholders, because Plaintiffs would

allegedly have received double the compensation under the latter method; (iii) omitting to state that policyholders would surrender their right to annual dividends from their contributions to MetLife's surplus; and (iv) misstating that reasonable dividends would "continue to be paid as declared," when in Plaintiffs' view the assets allocated to pay dividends had been limited. *See id.;* Plaintiffs' Second Amended Complaint at ¶¶ 28–54.

In sum and substance, Plaintiffs allege that PIB did not explain that policyholders received only 54¢ on the dollar for their policies, that dividends were reduced, and that MetLife engaged in fraud by not stating this in the PIB.

### B. *Statutes, rules and regulations*

Plaintiffs sue MetLife under Section 10(b) of the Securities Exchange Act and Rule 10b–5; MetLife moves to dismiss the Complaint under Rules 9 and 12 and the Private Securities Litigation Reform Act [the "PSLRA"].

Section 10(b) and Rule 10b–5 provide in pertinent part that it shall be unlawful for any person acting with scienter, directly, by use of the mails, to use in connection with the sale of any security any device in contravention of the rules of the Securities and Exchange Commission, such as the making of false statements or the omission of material facts in a prospectus. *See* 15 U.S.C. § 78j(b); 17 C.F.R. § 240.10b–5. (The parties agree that the PIB shall be treated as a prospectus for the demutualization transaction for the purposes of this litigation.)

Rule 9 provides that in all averments of fraud, the circumstances surrounding the fraud shall be stated with particularity. Rule 12 provides that a complaint may be dismissed for failure to state a claim upon which relief may be granted. And the PSLRA provides that when alleging material falsehoods or omissions in an action for securities fraud, the complaint must specify the falsehoods or omissions, why they are misleading, and state facts strongly inferring fraudulent intent. *See* FED. RS. CIV. P. 9(b) and 12(b)(6); 15 U.S.C. § 78u–4(b).

### C. *Standards of review*

On their motion to dismiss Plaintiffs' Complaint of securities fraud under Rule 12(b)(6), MetLife bears the burden of showing that even if the Complaint's allegations are accepted as true, and all reasonable inferences are drawn in Plaintiffs' favor, Plaintiffs are still not entitled to the relief sought. Dismissal is proper only if no relief could be granted under any set of facts consistent with Plaintiffs' allegations. However, under the heightened pleading standards of Rule 9(b) and the PSLRA, Plaintiffs' claim of securities fraud must allege MetLife's putative fraud with particularity, and demonstrate scienter of fraudulent intent on the part of MetLife by showing either the motive and opportunity to commit fraud, or strong circumstantial evidence of conscious misbehavior or recklessness by MetLife. *See Kalnit v. Eichler,* 264 F.3d 131, 138–39; *In re: Scholastic Corp. Secs. Litig.,* 252 F.3d 63, 69 (2d Cir.2001).

Assuming that Plaintiffs allege particular misrepresentations in the PIB, and also demonstrate strong evidence of MetLife's scienter, MetLife must then show that if these allegations are true, Plaintiffs are still not entitled to the relief sought. Even under Rule 9(b) and after the passage of the PSLRA, the standard for granting dismissal is still a high bar for defendants to clear. MetLife has not done so here.

### Discussion

### A. *The parties' arguments*

MetLife argues that "the documents cited by plaintiffs show that plaintiffs have mischaracterized or misstated defendants'

representations [in the PIB], and that the actual representations that defendants *did* make are true as a matter of law" (emphasis in original). Further, "[e]ven if plaintiffs had pleaded a misrepresentation, they have failed to plead scienter with the specificity required for a Rule 10b-5 claim." MetLife's Memorandum at 6, 11.

In response Plaintiffs narrow their argument to the four alleged misrepresentations: (i) the omission regarding the $15,300,000,000 value of the surplus as against $8,400,000,000 in stock given policyholders as compensation; (ii) the omission regarding the exchange of policies for stock with the right to elect cash, and why this was MetLife's chosen method of reorganization; (iii) the omission regarding policyholders' rights to annual dividends from the surplus; and (iv) the misstatement regarding reasonable dividends. *See* Plaintiffs' Response at 8–10; *see also* April 30, 2004 transcript at 19–29.

As for scienter, Plaintiffs argue that the "[a]llegations that defendants had actual knowledge of access to non-public information that contradicts the [PIB] establish strong circumstantial evidence of conscious misbehavior or recklessness," and specifically cite MetLife's internal calculation of a $15,300,000,000 contribution to MetLife's surplus by policyholders, which calculation was not disclosed to policyholders in the PIB, in contrast to the $8,400,000,000 in stock these policyholders received in the demutualization. Plaintiffs specifically emphasize a presentation on this subject by an actuary to MetLife's board of directors. And, as evidence of a motive and opportunity to commit fraud, Plaintiffs allege as a motive that "[f]or years Metropolitan secretly transferred $200 million of surplus on an annual basis to cover losses on certain products," that the demutualization "diverted billions of dollars away from participating policyholders," and that MetLife "hid this effect of the demutualization

through false statements and omissions" in the PIB. Plaintiffs' Response at 10–12; *see also* April 30, 2004 transcript at 25.

In reply and at oral argument, MetLife emphasizes that the four statements singled out by Plaintiffs were either not made to policyholders, or were demonstrably true. To wit: (i) as to the alleged omission regarding the value of MetLife's surplus versus the compensation given to policyholders, MetLife argues that "the PIB makes clear that the variable component of consideration is allocated in *proportion* to actuarial contributions, not in an amount *equal* to those contributions" (emphasis in original), that the difference between the $15 and $8 billion figures is therefore not germane, and that the total compensation given policyholders ultimately depended upon the performance of the initial public offering of MetLife's stock; (ii) as to the alleged omission regarding the exchange of policies for stock with the right to elect cash instead of cash with the right to elect stock, and the manner in which this would benefit MetLife at the expense of policyholders, MetLife argues that the PIB stated, accurately, that the form of consideration differed between these two methods, and that while there are an endless variety of possible methods of demutualization, the PIB made no larger claims as to the comparative fairness and equity of MetLife's chosen method; and (iii) and (iv) as to the alleged omission and misstatement regarding dividends, MetLife argues that as required by law, the demutualization plan expressly preserved the policyholders' rights to dividends, making the PIB's statements to this effect factually true, and that Plaintiffs have alleged no facts suggesting that reasonable dividends will not be paid in the future. *See* MetLife's Reply Memorandum at 2–7; *see also* April 30, 2004 transcript at 5–11.

Also in reply, MetLife argues regarding scienter that Plaintiffs' motive-and-oppor-

tunity theory is too broadly generalized, as a company's simple desire to raise capital is insufficient evidence of fraudulent intent under Rule 9 and the PSLRA. Furthermore, MetLife submits that none of the contested statements were "likely to sway policyholders to vote differently" regarding the demutualization, as the transaction resulted in a windfall to many policyholders, thus obviating a motive for MetLife to lie, because policyholders received valuable stock in exchange for what MetLife describes as their "ephemeral rights" to vote for MetLife's directors and to share in the assets of MetLife in the unprecedented event of a solvent liquidation of such a company. Also, MetLife avers that it had little opportunity to deceive its policyholders, as the demutualization transaction was scrutinized and approved by the State insurance regulators and by their outside actuarial, investment banking and law firms. *See* MetLife's Reply Memorandum at 8–9; *see also* April 30, 2004 transcript at 11–15.

Finally, regarding Plaintiffs' circumstantial evidence of MetLife's scienter of conscious or reckless disregard for the truth, MetLife argues that, as to the disputed valuation of the contributions to the surplus, that the $15,300,000,000 dollar figure was discussed throughout the PIB; that as to the differing methods of demutualization, the only evidence suggesting the viability of an alternative plan is a three year-old document; and that as to the dividend issue, the document cited by Plaintiffs discusses rights to the surplus beyond dividends, and not dividend rights as they existed. MetLife's Reply Memorandum at 8–9; *see also* April 30, 2004 transcript at 11–17.

### B. *The Policyholder Information Booklet*

The Court has again conducted its own study of the PIB, for the purpose of its decision on the instant motion only.

Regarding the issue of the surplus, the PIB states that, as to the additional compensation of participating policyholders, such persons "may be allocated additional shares. The number of additional shares you will receive will be based on an actuarial formula. The formula takes into account, among other things, the Policy's past and estimated future contributions to MetLife's surplus." *Id.* at 18. As to the calculation of this compensation, the PIB states that the "compensation you will receive in the demutualization will be calculated by multiplying the total number of shares of MetLife common stock allocated to you by the [initial public offering, or "IPO"] price ... Information concerning the number of shares allocated to you will be available from Met Life ... at a later date." *Id.* at 18–19. The $15,300,000,000 surplus figure is not, by the Court's reading, discussed as such in the text of the PIB, and neither is the $8,400,000,000 that would later be offered in compensation; rather, the former sum may be deduced from the financial data provided in the PIB.

Regarding the issue of the election of cash or shares, the PIB states that if "you are eligible to receive shares ... you may elect to receive cash for your shares instead ... The amount of cash you receive will be equal to the number of shares that are allocated to you under the terms of the [demutualization] Plan multiplied by IPO price." *Id.* at 10.

Regarding the issues surrounding dividends, the PIB states that "dividends will continue to be paid as declared," *id.* at 8, and that "[i]f you own a Participating Policy that provides for Policy dividends, you will remain eligible to receive dividends ... after the demutualization," and that "the Plan establishes an accounting mecha-

nism known as a Closed Block," as "to ensure that policyholders' reasonable dividend expectations will be met after a mutual insurance company converts to stock form." *Id.* at 44. Further, "MetLife will allocate assets to the Closed Block in an amount that it reasonably expects will, together with revenue from policies in the Closed Block, be sufficient to pay benefits and certain taxes and expenses of the Closed Block," and "MetLife will continue to pay guaranteed benefits, in accordance with policy terms, on all policies." *Id.* at 45.

## C. *Analysis*

Applying FED. RS. CIV. P. 9(b) and 12(b)(6) and the PSLRA to Plaintiffs' Section 10(b) and Rule 10b–5 claim, as these laws and rules and regulations are interpreted within this jurisdiction, the Court finds the following.

Plaintiffs point to specific statements within the PIB and to internal MetLife documents such as the actuarial report and the minutes of a Board of Directors meeting, that Plaintiff contends contradict public statements in the PIB. *See In re: Scholastic Corp. Secs. Litig.,* 252 F.3d 63, 72 (2d Cir.2001) (stating that a "plaintiff needs to specify the internal reports, who prepared them and when, how firm the numbers were or which company officers reviewed them"); *Novak v. Kasaks,* 216 F.3d 300, 309 (2d Cir.2000) (stating that "[w]here plaintiffs contend defendants had access to contrary facts, they must specifically identify the reports or statements containing this information").

Plaintiffs then allege that the PIB obscured the fact—as Plaintiffs would have it—that under the actuarial plan chosen for the demutualization, participating policyholders received little more than one-half the dollar value of their policies in compensatory stock, in contrast to com-

pensation commensurate with a policy's "past and estimated future contributions to MetLife's surplus." Plaintiffs also allege that the frequency and value of the policyholders' dividends have been or will be reduced, in contrast to the PIB's promises that "reasonable dividend expectations will be met" and that "MetLife will allocate assets to the Closed Block in an amount that it reasonably expects will ... be sufficient to pay benefits and certain taxes and expenses of the Closed Block." And Plaintiffs hold that contrary to MetLife's assertions in the PIB, MetLife was not fair and equitable in its treatment of policyholders. And these same policyholders presumably relied upon the statements in the PIB when they voted, to their supposed detriment, to approve the demutualization.

And while Plaintiffs' evidence of a scienter of motive and opportunity to commit fraud may not at this point be strong, Plaintiffs make a strong enough circumstantial showing, at the pleading stage, of a scienter of recklessness through MetLife's failure to more adequately explain the disputed issues in the PIB. And "securities fraud claims typically have sufficed to state a claim based on recklessness when they have specifically alleged defendants' knowledge of facts or access to information contradicting their public statements. Under such circumstances, defendants knew or, more importantly, should have known that they were misrepresenting material facts related to the corporation." *Novak,* 216 F.3d at 308.

If what is set forth in the preceding three paragraphs is true, and in considering this motion to dismiss the Court is obliged to assume that it is, Plaintiffs have set forth a valid complaint of securities fraud under Section 10(b) and Rule 10b–5. And, as the Court of Appeals stated in *Kalnit v. Eichler,* "dismissal is upheld only if 'it appears beyond doubt that the plain-

tiff can prove no set of facts in support of his claim which would entitle him to relief.'" 264 F.3d 131, 138 (2d Cir.2001) (citing *Ganino v. Citizens Utilities Co.,* 228 F.3d 154, 161 (2d Cir.2000)).

Plaintiffs may, at the end of the day, be wrong about the relative value of stock they received in exchange for their policies compared to the value of MetLife's surplus, or about what reasonable policyholders might have inferred from the phrase "an actuarial formula" taking "into account, among other things, the Policy's past and estimated future contributions to MetLife's surplus." Perhaps Plaintiffs are also wrong about what "reasonable dividend expectations" are, or about the way in which dividends have been, or will be, effected by the demutualization. Also, a fact finder might find that the way in which these issues were discussed in the PIB was not misleading, or that Plaintiffs' evidence of a scienter of recklessness on the part of MetLife is not convincing.

Yet these issues are, at their core, *factual* issues. They are better determined upon a motion for summary judgment, or ultimately at trial, than upon a motion to dismiss. As Plaintiffs' counsel put the matter at oral argument, "the purpose of a complaint is to give notice to the defendants so they can defend themselves," and MetLife's argument, while well taken by the Court, "is really in the nature of a closing argument to a jury or an impassioned plea for summary judgment." April 30, 2004 transcript at 18. MetLife's instant motion is, accordingly, **DENIED.** Discovery may continue regarding, *e.g.,* the circumstances under which the decision on how to value contributions to the surplus was arrived at, and how this decision was explained to policyholders, and also as to the funding of the "Closed Block" and the issuance of dividends.

## Conclusion

For the foregoing reasons, MetLife's motion to dismiss the Second Claim for Relief, of securities fraud, from the class action Plaintiffs' Second Amended Complaint, is **DENIED.** Plaintiffs allege particular misstatements and omissions in the PIB, and attempt to demonstrate Met-Life's scienter through strong circumstantial evidence of recklessness. Accepting Plaintiffs allegations as true and drawing reasonable inferences in their favor, Plaintiffs may be entitled to the relief they seek, and discovery in this case may therefore continue.

**SO ORDERED.**